## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE INTERNET ARCHIVE,<br><br>      Plaintiff,<br><br>      v.<br><br>JOHN JAY HOFFMAN, Attorney General of the State of New Jersey; *et al.*,<br><br>      Defendants, in their official capacities. | Civil Action No.: |

---

## PLAINTIFF THE INTERNET ARCHIVE'S BRIEF IN SUPPORT OF ITS MOTION FOR AN ORDER TO SHOW CAUSE AND ISSUANCE OF TEMPORARY RESTRAINTS TO PREVENT ENFORCEMENT OF P.L. 2013, c.51 § 12(b)(1)

---

Frank L. Corrado (SBN 022221983)
fcorrado@capelegal.com
BARRY, CORRADO & GRASSI, PC
2700 Pacific Avenue
Wildwood, NJ  08260
Telephone:  (609) 729-1333
Fax:  (609) 522-4927

Matthew Zimmerman
(*Pro hac vice* motion to be filed)
mattz@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone:  (415) 436-9333
Fax:  (415) 436-9993

*Attorneys for Plaintiff the Internet Archive*

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ....................................................................................................2

      A.   The Statute .................................................................................................2

      B.   The Impact on the Internet Archive and Other "Indirect" Actors ...........7

III.  ARGUMENT ..........................................................................................................9

      A.   Standards for Temporary Restraining Order or Preliminary Injunction .................9

      B.   The Preliminary Injunction Should Be Granted to Prevent Enforcement of § 12(b)(1) of the Act Because the Internet Archive Is Likely to Prevail on Its Claims ...........................................................................................................9

           1.   Section 12(b)(1) of the Act Conflicts with, and Is Therefore Preempted by, Section 230 of the Communications Decency Act. ...................................10

           2.   Section 12(b)(1) of the Act Violates the First and Fourteenth Amendments. ......................................................................................14

                i.    Section 12(b)(1) of the Act Impermissibly Creates a Strict Liability Crime. ...................................................................14

                ii.   Section 12(b)(1) of the Act Is Unconstitutionally Vague. .............15

                iii.  Section 12(b)(1) of the Act Is Overbroad and Insufficiently Tailored and Will Have a Chilling Effect on Constitutionally Protected Speech ........................................................................17

           3.   Section 12(b)(1) of the Act Violates the Dormant Commerce Clause by Improperly Regulating Interstate and Foreign Commerce. .......................19

      C.   The Internet Archive and Other Service Providers Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief .........................................22

      D.   The Balance of Equities Favors Granting a Preliminary Injunction. ...................23

      E.   The Preliminary Injunction Is in the Public Interest. ...............................................24

IV.   CONCLUSION.....................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Abu-Jamal v. Prince*,
154 F.3d 128 (3d Cir. 1998)..................................................................... 23

*ACLU v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003).................................................................... 25

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ............................................................... 21

*American Library Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) .......................................................... 22

*Ashcroft v. ACLU*,
535 U.S. 564 (2002)................................................................................. 18

*Ashcroft v. ACLU*,
542 U.S. 656 (2002)................................................................................. 24

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ...................................................................... 17, 18, 19

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012)................................... *passim*

*Bimbo Bakeries USA, Inc. v. Botticella*,
613 F.3d 102 (3d Cir. 2010)...................................................................... 9

*Boyce Motor Lines v. United States*,
342 U.S. 337 (1952)................................................................................. 16

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)................................................................................. 18

*City of Houston, Tex. v. Hill*,
482 U.S. 451 (1987)................................................................................. 19

*Conchatta, Inc. v. Evanko*,
83 Fed.App'x 437 (3d Cir. 2003).............................................................. 23

*Cruz v. Trotta*,
363 N.J. Super. 353 (App. Div. 2003) ..................................................... 13

*Cyberspace Communications, Inc. v. Engler*,
    55 F. Supp. 2d. 737 (E.D. Mich. 1999), *aff'd*, 238 F.3d 420 (6th Cir. 2000) .................. 22

*Donato v. Moldow*,
    374 N.J. Super. 475 (App. Div. 2005) ............................................................ 12

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................ 23

*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012)......................................................................... 15, 17

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)............................................................................ 15, 16

*Green v. America Online*,
    318 F.3d 465 (3d Cir. 2003)..................................................................... 6, 10

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)................................................................................ 20

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989)....................................................................... 23

*Hunt v. City of Los Angeles*,
    638 F.3d 703 (9th Cir. 2011) .................................................................... 19

*Kev, Inc. v. Kitsap County*,
    793 F.2d 1053 (9th Cir. 1986) ................................................................... 16

*Kolender v. Lawson*,
    461 U.S. 352 (1983)............................................................................ 15, 16

*Lanzetta v. New Jersey*,
    306 U.S. 451 (1939).............................................................................. 15

*Mitan v. A. Neumann & Associates, LLC*,
    No. 08-6154, 2010 WL 4782771 (D.N.J. Nov. 17, 2010) ................................. 11

*NAACP v. Button*,
    371 U.S. 415 (1963).............................................................................. 16

*Papachristou v. Jacksonville*,
    405 U.S. 156, 162 (1972)........................................................................ 15

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).................................................................. 20

*Pileggi v. Aichele*,
    843 F.Supp.2d 584 (E.D. Pa. 2012) ......................................... 9

*Reno v. ACLU*,
    521 U.S. 844 (1997)................................................... 6, 17, 19

*Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*,
    303 F.3d 959 (9th Cir. 2002) ................................................ 25

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)............................................................... 18

*Smith v. California*,
    361 U.S. 147 (1959)............................................................... 15

*Smith v. Goguen*,
    415 U.S. 566 (1974)............................................................... 16

*Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*,
    No. 09-4567, 2011 WL 900096 (D.N.J. March 15, 2011).............. 11

*State v. Reynolds*,
    124 N.J. 559 (1991) .............................................................. 13

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
    No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ...... 6

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)............................................................... 18

*United States v. Cochran*,
    17 F.3d 56 (3d Cir. 1994)...................................................... 15

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)............................................................... 19

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007)................................................. 12

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)............................................................... 17

*Virginia v. Hicks*,
    538 U.S. 113 (S.C. June 16, 2003)................................................................... 19

*Voicenet Communications, Inc. v. Corbett*,
    No. 04-1318, 2006 WL 2506318 (E.D. Pa. 2006) ........................................... 13

*Winter v. NRDC*,
    555 U.S. 7 (2008)................................................................................................ 9

*Zeran v. America Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ........................................................................... 10

## Rules

Civil Local Rule 65.1 ............................................................................................ 1

Federal Rule of Civil Procedure 65 ...................................................................... 1

## Constitutional Provisions

U.S. Const. amend I ..................................................................................... *passim*

U.S. Const. amend XIV ................................................................... 1, 9, 10, 14

## I.  INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65.1, Plaintiff the Internet Archive requests both a temporary restraining order and a preliminary injunction preventing enforcement of Section 12(b)(1) of the newly-enacted New Jersey law entitled the "Human Trafficking Prevention, Protection, and Treatment Act" ("the Act"), P.L. 2013, c. 51, which otherwise will take effect on July 1, 2013.  The statute is substantively identical to a bill passed into law in Washington State in 2012 (SB 6251), promptly enjoined as inconsistent with federal law and the U.S. Constitution, and repealed shortly thereafter.  Specifically, the Act—like SB 6251 before it—(a) violates and is preempted by Section 230 of the Communications Decency Act of 1996 ("CDA 230") as it seeks to hold online service providers legally responsible for certain acts of its users, (b) is unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments, and (c) violates the dormant Commerce Clause of the U. S. Constitution because it attempts to regulate commercial transactions that take place outside the state of New Jersey.

Absent the intervention of this Court, irreparable harm would occur as the threat of criminal sanctions posed by the Act's existence would impermissibly chill protected online speech by coercing online service providers to over-censor third-party content in an attempt to safely comply with the unclear dictates of the statute or to eliminate third-party services altogether.  As was done with its progenitor SB 6251 before it, Section 12(b)(1) of the Act—which will otherwise go into effect on July 1, 2013—should be enjoined.

## II.     BACKGROUND

### A.     The Statute.

On May 6, 2013, Governor Chris Christie signed into law the "Human Trafficking Prevention, Protection, and Treatment Act," P.L. 2013, c. 51.  Introduced as A3352 in October of 2012, the Act codified a collection of measures aimed at combatting sex trafficking.  While the bill understandably enjoyed widespread support given other non-controversial provisions— indeed, A3352 passed both houses of the legislature unanimously—legislators also recognized prior to their respective votes that one key provision might be vulnerable to claims that part of the bill conflicted with the First Amendment and CDA 230.[1]  They had good reason to be concerned:  Section 12(b)(1) of the newly-enacted law is almost a carbon copy of SB 6251, a Washington State anti-sex-trafficking bill that was enjoined as unconstitutional and in violation of federal law months before A3352 was introduced.  *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012).  Not directly targeting acts of prostitution, solicitation, or trafficking themselves, both of these statutes (materially identical, as shown below) created new criminal offenses for "advertising commercial sexual abuse of a minor" based on the online hosting of advertisements for such "services."  That is, under the terms of both the repealed Washington statute and the newly-passed New Jersey statute, hosts of third party speech can be found guilty of a felony based on the speech of others.

---

[1] *See*, *e.g.*, N.J. General Assemb. Judiciary Comm. hearing at 14:27 (Oct. 15, 2012) (N.J. Legislature's Assemb. Judiciary Comm. audio archive, *available at* www.njleg.state.nj.us/media/archive_audio2.asp?KEY=AJU&SESSION=2012 (last visited June 25, 2013) ("I think you are running a very close constitutional question on trying to punish people who provide the medium which other people then abuse."); N.J. Senate Judiciary Comm. hearing at 3:24:00 (Dec. 13, 2012) (N.J. Legislature's Senate Judiciary Comm. audio archive, www.njleg.state.nj.us/media/archive_audio2.asp?KEY=SJU&SESSION=2012)     (unidentified senator expressing concern about the legislation because an "almost identical" bill in Washington was "ruled unfavorably on" by a federal court.).

| **New Jersey's A3352 (P.L. 2013, c.51 § 12(b)(1))** | **Washington's SB 6251 (Wash. Rev. Code Ann. § 9.68A.104 (West 2012) (repealed 2013))** |
|---|---|
| (b) A person commits the offense of advertising commercial sexual abuse of a minor if:<br><br>(1) the person knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in this State and which includes the depiction of a minor; | (1) A person commits the offense of advertising commercial sexual abuse of a minor if he or she knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in the state of Washington and that includes the depiction of a minor. |
| (e) For the purposes of this section:<br><br>"Advertisement for a commercial sex act" means any advertisement or offer in electronic or print media, including the Internet, which includes either an explicit or implicit offer for a commercial sex act to occur in this State.<br><br>"Commercial sex act" means any act of sexual contact or sexual penetration, as defined in N.J.S.2C:14-1, or any prohibited sexual act, as defined in N.J.S.2C:24-4, for which something of value is given or received by any person.<br><br>"Depiction" means any photograph or material containing a photograph or reproduction of a photograph. | (a) "Advertisement for a commercial sex act" means any advertisement or offer in electronic or print media, which includes either an explicit or implicit offer for a commercial sex act to occur in Washington.<br><br>(b) "Commercial sex act" means any act of sexual contact or sexual intercourse, both as defined in chapter 9A.44 RCW, for which something of value is given or received by any person.<br><br>(c) "Depiction" as used in this section means any photograph or visual or printed matter as defined in RCW 9.68A.011 (2) and (3). |
| (f) It shall not be a defense to a violation of this section that the defendant:<br><br>(1) did not know the age of the minor depicted in the advertisement; or<br><br>(2) claims to know the age of the person depicted, unless there is appropriate proof of age obtained and produced in accordance with subsections g. and h. of this section. | (2) In a prosecution under this statute it is not a defense that the defendant did not know the age of the minor depicted in the advertisement. It is a defense, which the defendant must prove by a preponderance of the evidence, that the defendant made a reasonable bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, |

3

| | |
|---|---|
| (g) It shall be a defense to a violation of this section that the defendant made a reasonable, bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. The defendant shall prove the defense established in this subsection by a preponderance of the evidence. | dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. In order to invoke the defense, the defendant must produce for inspection by law enforcement a record of the identification used to verify the age of the person depicted in the advertisement. |

As with SB 6251 before it, the articulated intent behind the introduction and passage of Section 12(b)(1) of the Act was to combat advertisements for escorts, particularly on online classified websites. Assemb. Judiciary Comm., Legis. Sess. 2012-13, Statement to Assemb., No. 3352 (Oct. 15, 2012) *available at* www.njleg.state.nj.us/2012/Bills/A3500/3352_S1.HTM (last visited on June 26, 2013). And also as with SB 6251, the New Jersey legislation was explicitly motivated by a desire to combat the ongoing existence of escort advertisements on classified advertisement website Backpage.com. *See*, *e.g.*, P.L. 2013, c. 51 § 12(a)(5)-(6) ("Responding to political and public outcry, the Internet website craigslist.com removed its escort section, but another website with an escort section, backpage.com, has to date refused to do so"; "The states of Washington and Connecticut recently enacted laws to require Internet websites, such as backpage.com, and the patrons who advertise on websites, to maintain documentation that they have proved the age of the escorts presented in the advertisements[.]"); N.J. General Assemb. Judiciary Comm. hearing at 2:30 (Oct. 15, 2012) (N.J. Legislature's Assemb. Judiciary Comm. audio archive, *available at* www.njleg.state.nj.us/media/archive_audio2.asp?KEY=AJU&SESSI ON=2012 (last visited June 25, 2013) (recounting a story of a girl who was a "forced prostitute,"

Assemb. Valerie Vainieri Huttle noted that her "services were sold on Backpage.com"). However, even if antipathy towards Backpage.com and the type of material its users posted drove the introduction and passage of the statute, the Act's reach extends far beyond Backpage.com or even online classified sites generally.   For example, liability under Section 12(b)(1) of the Act would explicitly attach to publishers of traditional publications such as physical newspapers and not only to Internet publishers or distributors.  P.L. 2013, c. 51 § 12(e).  The statute also does not require that publishers or distributors of any type receive a direct financial benefit from user advertisements before criminal liability attaches.  Moreover, the statute has no explicit requirement that a distributor of third-party content intend for any illegal act (such as prostitution or sex trafficking) to take place.  At best, such a statute—one that imposes criminal penalties on indirect actors under imprecise conditions—is hopelessly vague and unenforceable.  At worst, it puts at risk neutral online actors, both in and outside New Jersey—for example, operators of blogs, wikis, social media sites, and online archives—who redistribute or otherwise make available third-party content.

While underage sex trafficking is an appalling practice that appropriately garners universal condemnation, the New Jersey legislature overreached in passing the Act, which is plainly in conflict with federal law.  The Act is vague and overbroad, as it would likely lead to the impermissible chilling of constitutionally-protected speech through self-censorship and arbitrary enforcement.  The Act also squarely conflicts with CDA 230 which immunizes providers of "interactive computer services" who host or distribute third-party content.  47 U.S.C. § 230(c)(1).  Congress created this immunity to limit the impact of federal or state regulations imposed on the Internet either through statute or through the application of common law causes of action.  *Id.* §§ 230(a)(4), (b)(2).  Congress thus recognized in CDA 230 what the

U.S. Supreme Court later confirmed when it extended the highest level of First Amendment protection to the Internet:  "governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it."  *Reno v. ACLU*, 521 U.S. 844, 885 (1997).   Indeed, both of these shortcomings were cited as grounds for enjoining the Washington statute from going into effect:  Judge Ricardo S. Martinez found that the bill was likely to "run[] afoul of the First Amendment" and to be "inconsistent with and therefore expressly preempted by Section 230."  *McKenna*, 881 F. Supp. 2d at 1273, 1275.

The Act's failings are not trivial or mere technicalities, especially as applied to online publishers and distributors.  Since its passage in 1996, CDA 230 has functioned as the bedrock upon which operators of online services of all kinds and sizes that provide access to third-party content have founded their operations.   Absent its protections, service providers would perpetually risk incurring liability whenever they failed to adequately and accurately screen for illegal or otherwise actionable third-party material they hosted or distributed.  *See*, *e.g.*, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (holding that online service providers can be held to be "publishers" of third-party comments, motivating Congress to pass CDA 230); *see also Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003) (explaining that CDA 230 "provides immunity to AOL as a publisher or speaker of information originating from another information content provider" because the "provision 'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.'") (citation omitted).  If states were free to impose liability on not only the creators of offending content but also on the providers of the channels

through which such content was distributed, operators would dramatically reduce the universe of content they would permit themselves to risk hosting, inevitably shrinking the availability to the public of low-cost outlets for constitutionally-protected speech.

**B.    The Impact on the Internet Archive and Other "Indirect" Actors.**

The Internet Archive is just such an actor concerned with the vagueness and overreach of the Act.  The Internet Archive is a 501(c)(3) non-profit that was founded to build an Internet library.  Kahle Decl. ¶ 4.  It offers permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format.  *Id.* Founded in 1996 and located in San Francisco, the Internet Archive works to prevent the Internet and other "born-digital" materials from disappearing into the past.  *Id.*  In late 1999, the organization expanded to include other media types to its collections.  *Id.* ¶ 5.  Today, the Internet Archive's collections include texts, audio, moving images, and software, as well as archived web pages.  *Id.*  It also provides specialized services for adaptive reading and information access for the blind and other persons with disabilities.  *Id.*  It collects and displays web materials on behalf of the Library of Congress, the National Archives, and most state archives and libraries, as well as universities and other countries, working to preserve a record for generations to come.  *Id.* ¶ 6.  The vast majority of the material in the Internet Archive's collection is material authored by third parties.  *Id.* ¶ 4.

As part of its mission to create an accurate and historically relevant archive of the Internet, the Internet Archive regularly gathers "snapshots" (accessible copies) of content on the World Wide Web through its "crawling" and indexing processes.  *Id.* ¶ 7.  It currently maintains over 300 billion web pages archived from 1996 to (nearly) the present from websites around the world, including archives of third-party content posted to web sites like Backpage.com and

craigslist.org. *Id.* ¶ 10. While it preserves for itself the ability to remove content at its own volition (and occasionally does so for a variety of reasons), even if it had unlimited resources it has no practical ability to evaluate the legality of any significant portion of the third-party content it archives and makes available.[2] Nor does it have the ability to obtain and retain copies of government-issued or school identification of all persons whose images are displayed in connection with an "implicit offer for a commercial sex act to occur in" New Jersey on the websites it indexes. *See id.* ¶ 14. Given that it inevitably archives and makes available copies of *some* content that may result in legal liability for the content's original authors, the Internet Archive is particularly alarmed by legislative efforts to extend liability to operators of conduits by which such content might be distributed or accessed.

The Internet Archive is deeply concerned about the expansive scope of the Act and the apparent belief of the members of the New Jersey legislature that third-party providers may be found criminally liable for hosting material posted by their users, whether or not they intend that any illegal act occur. The Internet Archive seeks not only to defend its interest in making digital archives of third-party content publicly available, but also to defend the proper interpretation of the important federal legal framework that helps ensure that the Internet Archive's work can proceed. It therefore asks that this Court grant a temporary restraining order and preliminary injunction in light of the statute's serious substantive and procedural failings and the harm to protected expression that will inevitably occur if it is allowed to go into effect.

---

[2] The Internet Archive has also on occasion disagreed with the legal validity of requests from third parties who insisted that it remove content or provide information about its users. *See*, *e.g.*, *Internet Archive's NSL Challenge: FBI Withdraws Unconstitutional NSL Served on Internet Archive*, ACLU, http://www.aclu.org/national-security/internet-archives-nsl-challenge (last visited June 24, 2013).

## III.     ARGUMENT

### A.     Standards for Temporary Restraining Order or Preliminary Injunction.

The standard for issuing a temporary restraining order and a preliminary injunction are the same.  *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (discussing this standard in the context of evaluating preliminary injunctions); *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012) (explaining that the standards for a temporary restraining order and a preliminary injunction are the same).  A plaintiff must show that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm if preliminary relief is not granted, (3) the balance of the equities tips in her favor, and (4) that an injunction is in the public interest.  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

The Internet Archive is likely to succeed on each of the four requirements.  Like the Washington bill before it, Section 12(b)(1) of the Act conflicts with and is therefore preempted by Section 230 of the Communications Decency Act, violates the First and Fourteenth Amendments to the United States Constitution, and violates the dormant Commerce Clause. Further, the Internet Archive and other service providers are likely to suffer irreparable harm absent injunctive relief.  Finally, the balance of the equities tips in favor of a preliminary injunction, which is in the public interest.

### B.     The Preliminary Injunction Should Be Granted to Prevent Enforcement of § 12(b)(1) of the Act Because the Internet Archive Is Likely to Prevail on Its Claims.

The Internet Archive is likely to succeed on the merits of its claims.  The Court should temporarily enjoin enforcement of Section 12(b)(1) of the Act by granting the motion for a temporary restraining order and preliminary injunction because Section 12(b)(1) of the Act violates and is preempted by CDA 230, because it is unconstitutionally vague and overbroad and

violates the First and Fourteenth Amendments, and because it violates the dormant Commerce Clause.

> **1.     Section 12(b)(1) of the Act Conflicts with, and Is Therefore Preempted by, Section 230 of the Communications Decency Act.**

Section 12(b)(1) of the Act squarely conflicts with Section 230 of the Communications Decency Act for three reasons.  First, pursuant to subsection (c) of CDA 230, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c); *see also* § 230(f)(3) ("The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.").  The statute thus immunizes online service providers from attempts to hold them liable for the behavior of and materials provided by third parties; *i.e.*, other "information content provider[s]."  *See America Online*, 318 F.3d at 471 ("By its terms, § 230 provides immunity to AOL as a publisher or speaker of information originating from another information content provider.  The provision 'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.'") (citing *Zeran v. America Online*, 129 F.3d 327, 330 (4th Cir. 1997)).

Some limited exceptions to CDA 230's protections are written into the statute, including carve-outs for intellectual property claims (section 230(e)(2)), for enforcement of the federal Electronic Communications Privacy Act (section 230(e)(4)), and for federal criminal law

(section 230(e)(1)).[3]  But if a proposed cause of action does not fall into such an exception, it is preempted:  "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." § 230(e)(3).  *See*, *e.g.*, *Mitan v. A. Neumann & Associates, LLC*, No. 08-6154, 2010 WL 4782771, at *3 (D.N.J. Nov. 17, 2010) ("Defendants['] . . . Communications Decency Act defense is unique, because it sounds in preemption.  This is because the CDA expressly states that '[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.'") (citation omitted).

The Internet Archive is a provider of an interactive computer service within the meaning of CDA 230.  *See* 47 U.S.C. § 230(f)(2) (defining an interactive computer service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions"); *see also*, *Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, No. 09-4567, 2011 WL 900096, at *4 (D.N.J. March 15, 2011) (recognizing that "courts generally construe the terms 'interactive computer service' very broadly" under the statute).  By providing and preserving access to software, film, audio, and text in digital format, the Internet Archive serves as an important conduit for Internet users to access information online that may otherwise disappear.  *See* Internet Archive, http://archive.org/about/about.php (last visited June 25, 2013).  Facilitating access to information was one of Congress's compelling policy objectives when it passed CDA 230 as it sought to preserve the Internet as a "forum for a

---

[3] The exception for *federal* criminal liability does not extend to state criminal laws that purport to trump the CDA.  *See*, *e.g.*, *McKenna*, 881 F. Supp. 2d at 1275 ("If Congress did not want the CDA to apply in state criminal actions, it would have said so.").

true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."  47 U.S.C. § 230(a)(3).

Second, section 12(b)(1) of the Act runs afoul of CDA 230 and is preempted as applied to providers of interactive computer services such as the Internet Archive who fall squarely within CDA 230's protections because it makes it a felony to "knowingly publish[], disseminate[], or display[] . . .  any advertisement for a commercial sex act, which is to take place in this State and which includes the depiction of a minor."  P.L. 2013, c. 51 § 12(b)(1).  To begin with, merely "knowing" that offending material resides or passes through a provider's system does not affect the protections provided by CDA 230.  *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) ("It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."); *see also Donato v. Moldow*, 374 N.J. Super. 475, 494 (App. Div. 2005) (explaining that under § 230, "immunity [is] not defeated by allowing admittedly improper (and potentially actionable) material to remain posted after notice from the offended party and an agreement to remove it."). The Act's limited scienter requirement does not take the statute outside the scope of CDA 230. Further, as Judge Martinez explained in granting an injunction for the Washington statute, these provisions "create[] an incentive for online service providers *not* to monitor the content that passes through its channels.  This was precisely the situation that the CDA was enacted to remedy."  *McKenna*, 881 F. Supp. 2d at 1273.

Finally, the scope of actors affected by the statute is inconsistent with CDA 230.  Under the Act, liability is not limited to the person who *authors* an offending advertisement; that is, the statute does not impose criminal liability solely on the "information content provider" who created the material in the first place.  Rather, criminal liability extends far beyond the limits set

by Congress.  Even the narrowest application of the narrowest elements of the statute—purporting to criminalize the "knowing[] publi[cation]" of an advertisement for commercial sex—violates CDA 230 to the extent the "publisher" is not also the author.  Such statutory language was, at minimum, intended to criminalize the direct publication of escort advertisements by sites such as Backpage.com.[4]  *See, e.g.*, *Voicenet Communications, Inc. v. Corbett*, No. 04-1318, 2006 WL 2506318, at *4 (E.D. Pa. 2006) ("CDA confers a § 1983-enforceable right upon internet service providers and users to not be 'treated' under state criminal laws as the publisher or speaker of information provided by someone else . . . .").

Liability does not end there, however; the Act as passed goes much further, extending not simply to "publish[ers]" but to those who "indirectly" "cause[]" advertisements "to be published, disseminated, or displayed."  P.L. 2013, c. 51 § 12(b)(1).  It is unclear how far legislators intended this causal chain to extend—perhaps, for example, to manufacturers of computer monitors who are informed that such advertisements are being "displayed" on their products, or to ISPs who are similarly notified about such advertisements flowing through their channels—but as written it extends beyond the initial publisher:  courts must give effect to the additional elements chosen by the legislature.  *See, e.g.*, *Cruz v. Trotta*, 363 N.J. Super. 353, 359 (App. Div. 2003) ("[E]ach word in a statute should be given effect.") (citing *State v. Reynolds*, 124 N.J. 559, 592 (1991)).  The only reasonable reading of such expansive statutory elements is that criminal

---

[4] *See* P.L. 2013, c. 51 § 12(a)(5) (explaining in legislative findings that "backpage.com" has "refused" to "remove[] its escort section"); *see also* N.J. General Assemb. Judiciary Comm. hearing at 9:22 (Oct. 15, 2012) (N.J. Legislature's Assemb. Judiciary Comm. audio archive, *available at* www.njleg.state.nj.us/media/archive_audio2.asp?KEY=AJU&SESSION=2012 (last visited June 25, 2013) (bill sponsor Assemb. Valerie Vainieri Huttle remarked: "I think obviously the publisher of the website of the adult services section of it, Backpage, quite frankly I'd like to shut down the adult services completely but obviously that is not constitutional, but for those of you that may be familiar with Backpage and the adult services, the publisher must ask for identification that these women are over 18 and if that's a burden so be it quite frankly.").

liability extends to other entities in the communications chain who do not "directly" host such online information but who in some way provide some sort of link to content created by others. No matter the interpretation, it fails because it makes interactive computer service providers liable for third-party speech.

Such an expansive scope threatens providers like the Internet Archive, which does not significantly develop or produce new information, and whose value and utility is premised upon its ability to preserve access to third-party content.  It thus fills a vital niche in online services by preserving and disseminating valuable historical records of online life.  Indeed, the Internet Archive's "Wayback Machine" makes available access to more than 300 billion web pages archived from 1996 onwards, including to recent and much earlier versions of content posted to Backpage.com.  *See generally* Internet Archive WayBack Machine, http://wayback.archive.org/web/*/http://backpage.com (last visited June 24, 2013).  The Act plainly conflicts with federal law by punishing interactive computer services for hosting, transmitting, or otherwise permitting unwelcome speech and cannot be allowed to go into effect.

> **2.      Section 12(b)(1) of the Act Violates the First and Fourteenth Amendments.**
>
> > i.      Section 12(b)(1) of the Act Impermissibly Creates a Strict Liability Crime.

Section 12(b)(1) of the Act also violates the First Amendment in several ways.  First, on its face, the statute impermissibly imposes criminal liability for speech acts without an accompanying scienter requirement.  While knowledge is a required element for criminal liability to attach for "publish[ing], disseminat[ing], or display[ing]" barred offers, liability can also strictly attach, without the knowledge element being satisfied, if anyone "causes directly or indirectly, to be published, disseminated, or displayed" those same offers.  P.L. 2013, c. 51

14

§ 12(b)(1).  While the state can without question bar unprotected speech, it cannot do so without a scienter requirement.  *See*, *e.g.*, *Smith v. California*, 361 U.S. 147, 153 (1959) (holding that a state obscenity statute could not constitutionally eliminate altogether a scienter requirement, and that, in order to be constitutionally applied to a book distributor, it must be shown that he had "knowledge of the contents of the book"); *U.S. v. Cochran*, 17 F.3d 56, 58 (3d Cir. 1994) (explaining that, "[i]n order to prevent chilling expression protect by the First Amendment, statutes criminalizing obscenity must require proof of scienter").  To the extent it does not contain a scienter requirement, this portion of the Act is unconstitutional.

ii.    <u>Section 12(b)(1) of the Act Is Unconstitutionally Vague.</u>

The vagueness of the Act also renders it unenforceable on First Amendment and due process grounds:  the Constitution requires this Court to strike down legislation if it is impermissibly vague and that requirement has special bite in the First Amendment context.  *See*, *e.g.*, *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'") (alteration in original) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)); *see also FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) (same).  This "basic principle of due process" is designed to protect citizens' autonomous choice "to steer between lawful and unlawful conduct," to constrain law enforcement, and to prevent chilling First Amendment protected speech.  *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).  The void-for-vagueness doctrine therefore forbids states to "delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis."  *Id.*  Vague statutes can otherwise "encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  For this reason, states are required to "establish minimal

15

guidelines to govern law enforcement." *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Because the Act fails to define essential terms cabining criminal liability, it vests complete discretion with the police and prosecutors to determine when to prosecute those who might "cause[] . . . indirectly, to be . . . disseminated" an "implicit offer for a commercial sex act to occur in" New Jersey. P.L. 2013, c. 51 § 12(b)(1), (e).

The Act fails to define important terms under the statute and thus prevents citizens from knowing what is prohibited. *See Grayned*, 408 U.S. at 108. Among the terms that the New Jersey legislature has neglected to define are "indirect[]," "direct[]," "implicit," and "offer." In the context of the identical Washington statute, Judge Martinez found that the statute's opponents were "likely to succeed in showing that such terms render the statute unconstitutionally vague." *McKenna*, 881 F. Supp. 2d at 1279. Additionally, as discussed above, the statute seems to require scienter if one "publishes, disseminates, or displays" a prohibited advertisement, but is imprecise as to the level of knowledge required if one "causes directly or indirectly" the publication of the same content. Clear scienter requirements can save an otherwise vaguely worded statute, but vagueness regarding the scienter can only doom the rest of the Act. *See Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952) (emphasizing that because the burden is on the government to prove the knowledge of the defendant, enforcing the statute would not result in arbitrary or discriminatory application)).

As alluded to above, courts are especially skeptical of vague statutes where free speech is at issue, because of "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *NAACP v. Button*, 371 U.S. 415, 432 (1963). Thus, courts apply a heightened vagueness analysis where

First Amendment freedoms are at stake.  "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "[R]igorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *FCC v. Fox*, 132 S. Ct. at 2307; *see also Reno*, 521 U.S. at 870-71 ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect.").

      iii.    <u>Section 12(b)(1) of the Act Is Overbroad and Insufficiently Tailored and Will Have a Chilling Effect on Constitutionally Protected Speech.</u>

Like the invalid Washington statute, Section 12(b)(1) of the Act is overbroad, threatening to "chill a substantial amount of protected speech" and to "cause dangerous chilling effects across the Internet."  *McKenna*, 881 F. Supp. 2d at 1282-83.  Assuming *arguendo* that the identified interest is compelling for First Amendment purposes (*i.e.*, eliminating "[s]ex trafficking of minors . . . in conformity with federal laws prohibiting the sexual exploitation of children," P.L. 2013, c. 51 § 12(a)(8)), the Act is most certainly not the least restrictive means to achieve it.  The Act encompasses vast amounts of speech that do not fit within the proscribed category.  At best, the restriction of  "implicit" advertisements for sex will impact ads for other products and services.  At worst, it will include advertisements for art, literature, and political discussion revolving around important social themes—speech that would otherwise enjoy constitutional protection.  *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) ("The statute proscribes the visual depiction of an idea—that of teenagers engaging in sexual activity—that is a fact of modern society and has been a theme in art and literature throughout the ages.").

17

Further, the Act's vague and expansive dictates, which impose unclear burdens on indirect actors, will likely lead to overbroad self-censorship in order to avoid potential criminal liability.  *See*, *e.g.*, *Free Speech Coal.*, 535 U.S. at 244 (holding that the Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere" and that a law imposing criminal penalties on speech is "a stark example of speech suppression" underscoring the need for facial challenges).  Legislation is overbroad when it suppresses a significant amount of protected speech in addition to the targeted, unprotected speech.  *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  As Judge Martinez explained when finding that the similarly-worded Washington statute was overbroad, if "'something of value' means anything that can be traded on a free market—including a bottle of wine, a nice dinner, or a promise to do the dishes," then the statute's "definition of 'commercial sex act' encompasses vast swaths of legal, consensual, and non-commercial sexual activity."  *McKenna*, 881 F. Supp. 2d at 1281.  This overinclusiveness prevents the law from being considered "narrowly tailored."  *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 123 (1991).  Moreover, the Act cannot "in fact alleviate [the identified] harms in a direct and material way."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  As a result, the Act is not the least restrictive means of achieving the government's interest, however construed.

Because it imposes liability on information conduits based on the content of third-party posts—explicit or implicit offers for commercial sex acts—the Act is also a content-based restriction on speech.  Content-based restrictions are "presumptively invalid," *Ashcroft v. ACLU*, 535 U.S. 564, 591 (2002) (Kennedy, J., concurring), and must satisfy strict scrutiny by being "narrowly tailored to achieve a compelling government interest" and the least restrictive means

to achieve that interest.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *see also Reno*, 521 U.S. at 874.  As discussed above, the Act is not the least restrictive means to achieve its stated goals.  Courts look on content-based restrictions enforced by recourse to criminal punishment with particular skepticism.  *See*, *e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987).  "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."  *Reno*, 521 U.S. at 872.  Criminal enforcement of an overbroad law thus threatens to chill more speech than statutes with only civil penalties.  *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).  Laws with criminal penalties are subject to heightened scrutiny for this very reason.  *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (applying a "more demanding standard of scrutiny" to situations where "criminal sanctions are involved and/or the law implicates First Amendment rights") (internal quotations omitted).  The aim of the statute is to prevent criminal conduct from taking place, but "[t]he evil in question depends upon the actor's unlawful conduct, conduct defined as criminal quite apart from any link to the speech in question."  *Free Speech Coal.*, 535 U.S. at 252.  And as in *Free Speech Coalition*, the criminalization of "implicit offers," without restriction as to the content, context, or wording of those offers, sweeps in as illegal much innocent speech as well.

      **3.**      **Section 12(b)(1) of the Act Violates the Dormant Commerce Clause by Improperly Regulating Interstate and Foreign Commerce.**

Section 12(b)(1) of the Act also runs afoul of the Constitution in that it is inconsistent with the dormant Commerce Clause.  The Commerce Clause prohibits individual states from regulating "Commerce with foreign Nations, and among the several States . . . ."  U.S. Const. art. I, § 8, cl. 3.  By passing the Act, however, New Jersey attempts to do just that.  On its face, Section 12(b)(1) of the Act criminalizes the knowing publication of a commercial offer for an act

to take place in the state of New Jersey.  The offer itself is sufficient to trigger liability, and no action need actually take place in the state.  As Judge Martinez explained when enjoining the Washington statute, it impermissibly "regulate[d] conduct that occurs wholly outside of the state of Washington."  *McKenna*, 881 F. Supp. 2d at 1285.  Moreover, the state seeks to impose criminal liability on entities that host or disseminate speech that is accessible to readers throughout the country and around the world.  By attempting to impose liability outside the state in this manner, New Jersey aims to do exactly what the dormant Commerce Clause prohibits— regulate interstate and foreign commerce; accordingly, the statute cannot stand.  *See*, *e.g.*, *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature.").

In *Pike v. Bruce Church, Inc.,* the Supreme Court set forth the "general rule" for "determining the validity of state statutes affecting interstate commerce."  397 U.S. 137, 142 (1970).  Under the *Pike* test, a statute that affects interstate commerce will be upheld "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest," where "its effects on interstate commerce are only incidental," and where the burden imposed on interstate commerce is not "clearly excessive in relation to the putative local benefits."  *Id*.  Section 12(b)(1) of the Act clearly fails this test.  The effect of the statute on interstate commerce is far more than incidental—it is part and parcel of the law's sweeping regulatory intent: to incentivize conduits of information, via the threat of criminal liability wherever they may be located, to take down advertisements that suggest offending conduct to take place within New Jersey.  Similarly, Judge Martinez noted of the Washington statute that its "out-of-state burden will be significant."

*McKenna*, 881 F. Supp. 2d at 1285.  Here too, the statute will of necessity reach interstate conduct, and the governmental interest in prosecuting wrongdoers is severely undermined by the practical obstacles to exercising jurisdiction over defendants whose criminal acts take place outside the state.  *ACLU v. Johnson*, 194 F.3d 1149, 1161–62 (10th Cir. 1999) (holding that a New Mexico statute that criminalized "dissemination" of materials that are "harmful to minors" violated the dormant Commerce Clause because "the nature of the Internet" made it impossible for the statute to reach purely intrastate conduct and the benefits to be achieved were limited).

In fact, the out-of-state burden imposed here will, by design, be significant, particularly for parties such as the Internet Archive that recirculate content from all 50 states.  The statute sets forth a single safe harbor to escape liability:  pre-publication screening of content and the collection of government-issued identification that must be produced for inspection on demand of law enforcement.  P.L. 2013, c. 51 §§ 12(g)-(h).  As criminal liability is triggered under the statute regardless of context—offending content may take the form not only of an ad appearing in a clearly-labeled "adult" section of a website that hosts classified ads but also an "offer" made in a general-purpose forum or even material mislabeled as a means of obfuscation—the statute would all but require the pre-screening of *all* content by *all* service providers who may occasionally, unintentionally, host offending content and want to ensure that they qualify for the safe harbor.  Such a requirement imposed by even a single state on service providers who disseminate or otherwise make available any significant amount of third-party content would be significant, to say the least, not to mention the possibility of multiple requirements from a multitude of states.

The Internet, which facilitates fluid cross-border transactions, highlights the concerns about inconsistent state regulation.  As one leading case explained:

The courts have long recognized that certain types of commerce demand consistent treatment and are therefore susceptible to regulation only on a national level.  The Internet represents one of those areas; effective regulation will require national, and more likely global, cooperation.  *Regulation by any single state can only result in chaos*, because at least some states will likely enact laws subjecting Internet users to conflicting obligations.  Without the limitation's [*sic*] imposed by the Commerce Clause, these inconsistent regulatory schemes could paralyze the development of the Internet altogether.

*American Library Ass'n v. Pataki*, 969 F. Supp. 160, 181 (S.D.N.Y. 1997) (emphasis added).

Similarly, Judge Martinez found in enjoining the Washington statute that the "Internet is likely a unique aspect of commerce that demands national treatment."  *McKenna*, 881 F. Supp. 2d at 1286.  Indeed, courts across the country have applied the Commerce Clause to strike down attempts by states to regulate or otherwise burden Internet communications.  *See*, *e.g.*, *Cyberspace Communications, Inc. v. Engler*, 55 F. Supp. 2d. 737, 752 (E.D. Mich. 1999) (finding Commerce Clause violation because state regulation "would subject the Internet to inconsistent regulations across the nation"), *aff'd*, 238 F.3d 420 (6th Cir. 2000).  For all of these reasons, Judge Martinez found that opponents of Washington's near-identical statute were "likely to succeed on their claims" that the statute "violates the dormant Commerce Clause." *McKenna*, 881 F. Supp. 2d at 1286.  The New Jersey statute is similarly fundamentally flawed and inconsistent with the dormant Commerce Clause, and the Court should bar implementation on this ground as well.

**C.    The Internet Archive and Other Service Providers Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief.**

If the Court does not enjoin enforcement of the Act, providers of interactive computer services, like the Internet Archive, and the public will suffer irreparable harm.  Faced with a combination of severe criminal penalties and unclear restrictions, providers of online speech channels will quickly grow more conservative, and opportunities for protected speech, especially

on the margins, will likely begin to dry up.  Speakers and listeners alike will suffer when platforms and others in the speech chain grow more wary or disappear altogether.  Given these onerous penalties, the Internet Archive and other service providers effectively will be coerced into shutting down certain forms of speech—amounting to a "'chilling effect on free expression.'"  *Conchatta, Inc. v. Evanko*, 83 Fed.App'x 437, 442 (3d Cir. 2003) (quoting *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989)).  Further, the conditions created by the Act amount to "a 'real or immediate' danger to [plaintiff's] rights 'in the near future,'" satisfying this Court's standard for recognizing irreparable harm.  *Conchatta*, 83 Fed.App'x at 442 (quoting *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997)).  In *Abu-Jamal v. Prince*, the court explained that the "timeliness of speech is often critical" and is therefore relevant to evaluating harm for purposes of a preliminary injunction. 154 F.3d 128, 136 (3d Cir. 1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury")).  Indeed, given that the Internet Archive likely inevitably archives and makes available copies of *some* content that may result in criminal liability for the content's original authors under Section 12(b)(1), the Internet Archive has a reasonable fear of prosecution under the new statute.  Kahle Decl. ¶ 15

      **D.**      **The Balance of Equities Favors Granting a Preliminary Injunction.**

The harm suffered by the Internet Archive and other online service providers in the absence of preliminary relief is greater than the harm suffered by New Jersey if the law is enjoined.  As Judge Martinez found in enjoining SB 6251, "[t]he harm to the Government will not be great."  *McKenna*, 881 F. Supp. 2d at 1286.  Preliminary relief would maintain the status quo, permitting law enforcement to continue to investigate and arrest sex traffickers but precluding (at least for the moment) reliance on legislation targeting not criminals but the operators of platforms over which messages are carried.  New Jersey has numerous laws and

other methods at its disposal to combat child trafficking.  The liberty interests of those who provide access to information should not be threatened in the meantime.

> ### E.      The Preliminary Injunction Is in the Public Interest.

In enjoining the Washington statute, Judge Martinez explained that the injunction was "in the public interest" because, "'[w]here a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech.'" *McKenna*, 881 F. Supp. 2d at 1286 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004)). Precisely the same interest exists here.  Absent an injunction, the statute will not only violate CDA 230, but moreover will contravene the congressional policy undergirding the federal regulation—policy that explicitly seeks to advance the public interest.  Specifically, Congress found that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens," which "have flourished, to the benefit of all Americans, *with a minimum of government regulation*."  47 U.S.C. § 230(a)(1), (4) (emphasis added).  Further, CDA 230 provides that it is national policy "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*."  47 U.S.C. § 230(b)(1)-(2) (emphasis added).

In considering preliminary injunctions, the Third Circuit has recognized that the "public interest [is] 'not served by the enforcement of an unconstitutional law,'" specifically concerning regulations that would restrict First Amendment liberties.  *ACLU v. Ashcroft*, 322 F.3d 240, 247

(3d Cir. 2003), *aff'd*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004).  Enjoining the Act is consistent with the Third Circuit's holdings regarding the public interest because, as Judge Martinez and the CDA 230 congressional findings suggest, there is a significant risk that intermediaries will "self-censor," chilling speech on the Internet and stifling the Internet's growth—all of which undermines the public interest.  Additionally, courts throughout the country have found that the "[t]he public interest inquiry primarily addresses the impact on non-parties rather than parties," in particular attending to the "significant public interest in upholding First Amendment principles."  *Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002).

Section 12(b)(1) of the Act threatens to burden large swaths of constitutionally and statutorily protected speech and the underlying platforms for that speech.  The preliminary injunction should be granted because the risked harm to protected speech is too great and counter to the public interest.

## IV.    CONCLUSION

Plaintiff the Internet Archive has established that: (1) it is likely to succeed on the merits because Section 12(b)(1) of the Act is expressly preempted by federal statute, unconstitutionally vague and overbroad, and in violation of the dormant Commerce Clause; (2) it will suffer irreparable harm if this section is not enjoined; (3) the balance of equities tips in favor of granting preliminary relief; and (4) the public interest favors protecting First Amendment freedoms.  All of the required elements for temporary restraints and a preliminary injunction are met.

Accordingly, for the reasons stated above, the Internet Archive respectfully requests that its application for a temporary restraining order be granted, enjoining enforcement of Section

12(b)(1) of the Act, and that an order to show cause issue, permitting full briefing and argument

regarding why a preliminary injunction Section 12(b)(1) should not issue.


Dated: June 26, 2013                    Respectfully submitted,

                              By: _/s/ Frank L. Corrado_____
                                  Frank L. Corrado
                                  BARRY, CORRADO & GRASSI, PC
                                  2700 Pacific Avenue
                                  Wildwood, NJ  08260
                                  Telephone:  609-729-1333
                                  Fax:  (609) 522-4927

                                  Matthew Zimmerman
                                  ELECTRONIC FRONTIER FOUNDATION
                                  815 Eddy Street
                                  San Francisco, CA 94109
                                  Tel:  (415) 436-9333
                                  Fax: (415) 436-9993